**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Barry D. Leiwant
*Interim Executive Director*
*and Attorney-in-Chief*

*Eastern District of New York*
Michelle A. Gelernt
*Interim Attorney-in-Charge*

February 6, 2024

**By ECF**

The Honorable Joan M. Azrack
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE:   *United States v. Kai Heyward*, 22 CR 87 (JMA)

Dear Judge Azrack:

When he was fourteen years old, Kai Heyward's father passed away from kidney failure. Though his mother was able to support the family financially through her work as a police officer for the NYPD, she was often away from home for long hours. Mr. Heyward lost his way after his father's death. Though he had excelled at football as a youngster, he stopped playing for a time after his father's death (his father had been his coach). His work and comportment in school suffered. Mr. Heyward's disaffection grew as several young acquaintances from his Canarsie neighborhood met untimely, violent deaths.

Mr. Heyward struggled after the death of his father. He eventually began playing football again as an older teenager, even earning a scholarship to a private high school. However, the loss of his father and the effect of injuries had stolen his joy for the game. After quitting the sport, he had to leave two high schools for disciplinary reasons and did not graduate. In 2020 and 2021, while still a young man and living in Canarsie, Mr. Heyward committed the instant offense. In 2020, he was also arrested twice for misdemeanors. Convictions related to those offenses place him in criminal history category II.

In 2022, Mr. Heyward's mother retired from the NYPD and moved the family to a rural area in Delaware, partially because she could see her son's struggles in Brooklyn.[1] Mr. Heyward was arrested on the instant case at his family's Delaware

---

[1]   The PSR mistakenly dates the move to Delaware as occurring in 2012. *See* PSR ¶ 57.

home on February 17, 2022. He was later ordered removed to Brooklyn in custody. He first appeared in this district on March 1, 2022, when he was released on a bond with a condition of home detention. He remained on home detention for seventeen months, after which he was placed on a restrictive curfew which still applies.[2] Though he sought employment while on pretrial release, there were few job opportunities available to him in nearby towns.[3] The conditions of his release and having only one car available to the family made it impossible for him to seek employment further away from his home.

In the plea agreement, the parties anticipated that the final offense level would be 20, with a corresponding sentencing range of 33-41 months. Mr. Heyward stipulated to this calculation. Because the probation department places Mr. Heyward in criminal history category II, the sentencing range is higher than the plea agreement anticipated. Mr. Heyward does not object to this guideline range but notes that the probation department recommends a sentence of 24 months, considering Mr. Heyward's age at the time of the offense and his father's untimely death.

A sentence well below the guideline range, and below that recommended by probation, is warranted here based on the nature of the offense and Mr. Heyward's history and characteristics, including the traumatic death of his father and several of his friends, his move to Delaware prior to his arrest, and the restrictive conditions of release he has lived under for the last two years.

**18 U.S.C. § 3553(a)**

18 U.S.C. § 3553(a)'s "parsimony principle" "instructs courts 'to impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017). That principle, applied in light of the statutory sentencing factors, supports sentencing Mr. Heyward to a sentence well below the guideline minimum.

In determining the appropriate sentence, the Court must weigh several factors, including Mr. Heyward's personal history and characteristics, the nature and circumstances of the offense, and any mitigating factors that may exist. *See, e.g., United States v. Hernandez*, 604 F.3d 48, 55 (2d Cir. 2010). The Supreme Court

---

[2] Initially, Mr. Heyward's curfew allowed him to be away from home from 9:00 a.m. to 3:00 p.m. on weekdays. Only recently, on January 22, 2024, was the curfew extended to 7:00 p.m. on weekdays.

[3] Clayton and Smyrna, Delaware, the towns closest to Mr. Heyward's home, had a combined population of about 16,000 during the 2020 census.

has repeatedly affirmed a federal judge's ability to grant a variance from the advisory guideline range based on the § 3553(a) factors. *See, e.g., Beckles v. United States*, 137 S. Ct. 886, 892 (2017). The Supreme Court has also made clear that granting a variance does not require a showing of extraordinary or special circumstances. To the contrary, "courts are entitled to vary from the . . . guidelines in a mine run case where there are no 'particular circumstances' that would otherwise justify a variance from the guidelines' sentencing range." *Spears v. United States*, 555 U.S. 261, 267 (2009) (internal quotation omitted).

**Nature and circumstances of the offense**

As noted above, Mr. Heyward stipulated to the guideline calculation in this case—a calculation that includes an enhancement for loss of more than $250,000. PSR ¶¶ 16, 32. This is the amount of actual loss attributed to actions of all eleven defendants. Mr. Heyward's individual conduct resulted in far less loss—$24,372. PSR ¶ 16. Of course, the guidelines allow loss caused by other members of a conspiracy to raise a defendant's guideline range under the theory of "relevant conduct." *See* USSG §1B1.3(1)(B). In this case, however, the use of relevant conduct overstates Mr. Heyward's culpability and warrants a variance below the recommended guideline range.

The use of relevant conduct here causes a drastic increase in the guideline range. The loss amount increases by factor of more than twenty, from $24,372 to $522,746 and the guideline enhancement increases from 4 to 12. *See* USSG §2B1.1(b)(1)(C) *and* (G). If the loss attributable only to Mr. Heyward's conduct was used, the final offense level would be 12 and the guideline range would be 12-18 months.

Further, though Mr. Heyward pleaded guilty to conspiracy, the nature of this conspiracy was less centralized and organized than most conspiracies. The defendants shared knowledge about how to purchase identity information on Telegram and how to submit applications for unemployment insurance using that information. After learning these methods, however, Mr. Heyward did not share identity information or the proceeds of the fraud with other conspirators. Neither did he receive identity information or proceeds from them.

None of the above is intended to minimize Mr. Heyward's criminal conduct or to denigrate the seriousness of the offense. Obviously, this sort of fraud is serious and deserving of prosecution. Acknowledging that, however, does not lessen the importance of sentencing a person based on his or her actual conduct. The applicable guideline range overstates the seriousness of Mr. Heyward's actions, and the court should vary downward from the guideline range.

### Mr. Heyward's history and characteristics

Mr. Heyward's father passed away unexpectedly from kidney failure almost ten years ago when, Mr. Heyward was only fourteen years old. One might be tempted to say that this trauma, serious though it was, cannot excuse (or even explain) the instant offense or the conduct that led to Mr. Heyward's misdemeanor convictions. This would be a mistake. Mr. Heyward and his father were extraordinarily close and spent an unusual amount of time together, including one coaching the other on the football field. His father's death left Mr. Heyward confused and bereft. Though he was lucky that his mother had a career that could support the family financially, her work kept her away from home and left Mr. Heyward unsupervised for much of his days.

Mr. Heyward had difficulty handling the unexpected trauma of his father's death and started doing, and behaving, poorly in school. His attempt to right his sinking ship by playing football at a private high school did not work out. Injuries had reduced his skill as a player. He was also required to repeat the tenth grade, which made him feel like a failure. He left that school after one year and, though he attended other high schools thereafter, he did not graduate.

As a teenager and young adult, Mr. Heyward was exposed to significant trauma because of violent crime in his Canarsie neighborhood. No fewer than six of his close friends met violent ends in the past few years. This background only added to Mr. Heyward's confusion and feelings of hopelessness and clearly contributed to the conduct which brings him before the Court for sentencing.

In 2022, before his arrest in this matter, Mr. Heyward moved with his mother and brother to a rural hamlet in Delaware. His mother and he decided that starting over, away from Brooklyn, was the best option for him.[4] This is notable because it is evidence of Mr. Heyward's desire to change his life; he had the option to remain in Brooklyn had he wanted. Life in Delaware has not been easy; Mr. Heyward has been unable to find work. But he keeps at it, as his mother writes, "his attitude now is to keep trying." (Ex, A).

Mr. Heyward's decision to improve his life is also evidenced by his compliance with very strict conditions of release. Conditions that, even today, two years after his arrest, require him to be at home from 7:00 p.m. to 9:00 a.m. on weekdays and all day on weekends. This compliance, as well as the strict nature and length of his release conditions are relevant to the sentence this Court will impose.

---

[4] Attached as Exhibit A are letter from Mr. Heyward's mother and brother addressed to the Court regarding sentencing.

## CONCLUSION

Because of the large amount of loss attributed to Mr. Heyward through relevant conduct of others, a guideline sentence here would be more severe than necessary to serve the ends of justice. Mr. Heyward's background, including the loss of his father as a young teenager and his subsequent struggles, also warrants a sentence below the guideline range.

Mr. Heyward's move to Delaware prior to his arrest, as well as his compliance with strict conditions of pretrial release for two years indicate that he is prepared to move on to a more productive stage of his life. He asks the Court to impose a sentence that allows him to do so.[5]

Thank you for your attention to this matter.

Respectfully submitted,

/s/
_____
Michael K. Schneider, Esq.
Assistant Federal Defender
(718) 330-1161

cc:   Clerk of the Court [by ECF]
      AUSA Michael Gibaldi [by ECF and email]
      AUSA Claire S. Kedeshian [by ECF and email]
      USPO Ashtin Audain [by email]
      Mr. Kai Heyward [by email]

---

[5] Mr. Heyward is, of course aware of the sentences imposed on two of his codefendants: Mr. Brown and Mr. Jean-Pierre—22 and 25 months respectively. Mr. Heyward's case can be distinguished from those. Unlike Mr. Heyward, Mr. Brown was apparently unable to abide by the conditions of his pretrial release and was incarcerated for months prior to sentencing. Mr. Jean-Pierre was individually responsible for more than $130,000 of loss, more than five times the amount attributable to Mr. Heyward. Thus, a lesser sentence for Mr. Heyward would not contravene "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).